**MORRISDALE COAL CO. v. COMMIS-
SIONER OF INTERNAL REVE-
NUE.**

**MORRISDALE LAND CO. v. SAME.**

**MORRISDALE SUPPLY CO. v. SAME.**
Nos. 5991–5993.

Circuit Court of Appeals, Third Circuit.
May 6, 1938.

George E. H. Goodner, of Washington, D. C., for petitioners.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Ellis N. Slack, Sp. Assts. to Atty. Gen., for respondent.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

BIGGS, Circuit Judge.

It is agreed by the parties that the issues involved in cases No. 5992 and No. 5993 are precisely those raised by the assignments of error in case No. 5991. We therefore will deal with the facts and the law relating to case No. 5991, since our rulings in this case, being equally applicable to the first two cases referred to, will dispose fully of the issues there presented.

In case No. 5991 the issues involved are set out clearly in the assignments of error.[1] We think that the questions of law raised can be disposed of best by deal-

1. The Board erred in holding that petitioner was not affiliated with the Morrisdale Land Company and the Morrisdale Supply Company for tax purposes during the calendar year 1917.

2. The Board erred in finding and holding that the value of certain coal in the ground, conveyed to the Land Company on July 9, 1914, for its stock and bonds was only $136,359.76 on that date; and in finding and holding that the depletion deductions allowable in computing the net income of the Land Company (and therefore the consolidated net income) for all years should be based on this value; and in finding and holding that only this amount, less depletion sustained, should be included in the invested capital of the Land Company (and therefore in the consolidated invested capital) for all years.

3. The Board erred in finding and holding that the value of certain buildings conveyed to the Land Company on July 9, 1914, for its stock and bonds was only $40,000 on that date; and in finding and holding that the depreciation deductions allowable in computing the net income of the Land Company (and therefore the consolidated net income) for all years should be based on this value; and in finding and holding that only this amount, less depreciation sustained, should be included in the invested capital of the Land Company (and therefore in the consolidated invested capital) for all years.

4. The Board erred in finding and holding that certain coke ovens conveyed to the Land Company on July 9, 1914, for its stock and bonds was nothing instead of finding and holding that the value thereof was not less than $31,008.33, and in denying depreciation deductions to the Land Company in computing its net income (and therefore the consolidated net income) for all years; and in excluding any value whatever in respect of such coke ovens from the invested capital of the Land Company (and therefore from consolidated invested capital) for all years.

5. The Board erred in finding and holding that the value of certain lands conveyed to the Land Company on July 9, 1914, for its stock and bonds was only $4,840, instead of finding and holding that the value thereof was not less than $24,200; and in excluding the value thereof in excess of $4,840 from the invested capital of the Land Company (and therefore from consolidated invested capital) for all years.

6. The Board erred in finding and holding that the value of certain machinery and equipment conveyed to petitioner as paid-in capital on July 9, 1914, was only $134,196 and in failing to find and hold that the value was $302,311.01; and in finding and holding that the depreciation deductions allowable in computing net income of petitioner (and therefore consolidated net income) should be based on such lesser amount; and in finding and holding that only the lesser amount, less depreciation sustained, should be included in the invested capital of petitioner (and therefore consolidated invested capital) for all years.

7. The Board erred in holding that the coal leases owned by petitioner on March 1, 1913, had no value on that date; and in failing to allow depletion deductions to the petitioner in respect thereof in computing net income (and therefore consolidated net income) for all years.

8. The Board erred in finding and holding that the cost of petitioner's development on its coal leases was only $222,246.41, and not some greater amount, up to March 1, 1913; and in allowing depletion deductions in respect thereof in the computation of the net income of petitioner for the various years (and therefore in consolidated net income) in the amounts of only .64 cents per ton on part of the coal produced and of only 1.42 cents per ton on part of it, for all

ing with the assignments of error seriatim. A preliminary statement of facts is essential, however, in order that the circumstances of the case may be understood.

The Board of Tax Appeals determined that deficiencies were due from the petitioner by reason of income and excess profits tax liability for the years ending June 30, 1917 to 1923, inclusive, and for the year ending June 30, 1927.

The petitioner is a corporation of the State of Pennsylvania and at the times with which we are concerned was engaged in the mining of coal in Clearfield county, Pennsylvania. When it was organized in 1894 its stock was owned by two brothers, B. Frank Clyde and William P. Clyde, and Frank H. Wigton was employed as the executive head of the company entitled to receive compensation by way of the stock of the corporation. B. Frank Clyde died in 1906. William P. Clyde, desiring to dispose of all of his business interests so that he might retire, upon August 3, 1906, acting with the executors of his brother's estate, made an agreement with Wigton whereby it was agreed that all of the real estate, mining plants and railroad cars belonging to the petitioner should be transferred to a trustee for the purpose of effecting the terms of a contemplated sale from Clyde and Clyde's executors to Wigton for the sum of $125,000. It was agreed by the parties that until Wigton should carry out the terms of the agreement and pay the stipulated sum, the trustee should lease to him the real estate, mining plants and railroad cars referred to at a stipulated rental which should serve in lieu of interest upon the sum of the purchase price. The agreement also provided that Wigton should purchase from Clyde and Clyde's executors, who must sell, at the price of $46.50 per share, all of the stock of Morrisdale Supply Company, a New Jersey company, which had been incorporated in order to serve as a commissary company for the sale of merchandise and supplies to the employees of the Coal Company. The agreement also provided that upon its execution, all of the stock of the Coal Company owned by the Clyde brothers should be transferred to Wigton for the consideration of a dollar.

The terms of this agreement were extended to August 1, 1914, by supplemental contracts entered into by the parties.

In accordance with the provisions of the agreement of August 3, 1906, the petitioner, the Coal Company, transferred to

---

years up to and including 1923; and in the amounts of .7 cents per ton on part and 1.57 cents per ton on part for all years beginning with 1924.

9. The Board erred in excluding from petitioner's invested capital (and therefore from consolidated invested capital) for all years the sum of $222,246.41 representing the cost of development of petitioner's coal leases, as determined by the Board; and in failing to find and hold that the cost was greater than this amount.

10. The Board erred in disallowing a loss of $55,975 in computing the net income of petitioner (and therefore consolidated net income) for 1919, which loss occurred through the abandonment of Shaft No. 2 by petitioner in that year.

11. The Board erred in disallowing losses in the computation of the net income of petitioner for the years 1919 and 1920 (and therefore in consolidated net income for those years) in the amounts of $9,214.26 and $1,783.38, respectively, which losses were due to the abandonment and sale of machinery and equipment used at Shaft No. 2 when that shaft was abandoned.

12. The Board erred in disallowing a loss in the computation of the net income of the Land Company for 1919 (and therefore the consolidated net income for that year) in the amount of $2,634.40, which loss was due to the abandonment of buildings owned by the Land Company at Shaft No. 2 when that shaft was abandoned.

13. The Board erred in excluding from the invested capital of petitioner (and therefore from consolidated invested capital) for the fiscal years 1918 to 1922, inclusive, the sum of $212,325.53 representing preferred stock issued by petitioner on June 20, 1918, for that amount of consideration.

14. The Board erred in excluding from the invested capital of petitioner (and therefore from consolidated invested capital) for the fiscal years 1918 to 1922, inclusive, the sum of $20,205.12 representing preferred stock issued by petitioner on June 20, 1918, in cancellation of that amount of indebtedness.

15. The Board erred in holding that earned surplus of the Supply Company in the amount of $54,129.84 on July 1, 1917, should be excluded from consolidated invested capital for the fiscal year ending June 30, 1918, when computing same under the provisions of the Revenue Act of 1918, 40 Stat. 1057, at 1918 rates.

the trustee the property heretofore referred to and the lands of the Coal Company. Upon August 13, 1906, the Coal Company and Wigton entered into an agreement whereby Wigton agreed to sell and the Coal Company agreed to purchase the real estate and personal property referred to in the agreement of August 3, 1906, for the sum of $165,000. This agreement also provided that the stipulated purchase price of $165,000 should be paid in notes, having a face value of $40,000, bearing 6 per cent. interest, payable monthly, and that the balance of the purchase price be paid within a year. The contract also provided that the trusteed property should be leased to the Coal Company at a rental of $625 per month, which was the sum of the rental required for it from Wigton by the Clyde brothers under the agreement of August 3, 1906.

Upon July 7, 1914, Clyde and Clyde's executors with Wigton sent a written communication to the trustee, to the effect that the lands and premises known as the "Morrisdale Mines property," with certain exceptions, and not including the grant of any personal property, should be transferred by the trustee for the sum of $200,000 to a company about to be created, to be known as the "Morrisdale Land Company." The sum of the consideration, viz., $200,000, was to be secured by a mortgage on the real property and bonds to the extent of $200,000 were then to be issued. Of these bonds, $115,000 face value were to be delivered immediately to Wigton and the remaining bonds were to be sent to the Philadelphia Trust Safe Deposit and Insurance Company to be held by it for the purposes of the trust, set forth in the agreement of August 3, 1906.

Two days later, as contemplated, Wigton organized the Morrisdale Land Company. All of the capital stock of this company, viz., $5,000 par value, was issued to him. The trustee thereupon conveyed all of the real property, which he held under the agreement of August 3, 1906, to the Land Company. The property thus conveyed included interests in coal lands and the fee-simple title to two hundred forty two acres of surface land. Upon July 9, 1914, there were buildings and coke ovens standing upon this surface land. The mortgage was given as contemplated and the bonds secured thereby were issued according to plan.

**(1) As to the Question of Affiliation of the Coal Company with the Land Company and the Supply Company during the Calendar Year, 1917.**

The Board held that the Coal Company was not affiliated with the Land Company and the Supply Company for tax purposes during the calendar year 1917, though the Land Company and the Supply Company were so affiliated. The petitioner contends that all three companies were affiliated throughout the year 1917.

The applicable statute is the Revenue Act of 1921, c. 136, 42 Stat. 227,[2] which provides for the consolidation of corporations for excess profits tax purposes in 1917. The pertinent parts of the statute are as follows:

"Sec. 1331. (a) That Title II of the Revenue Act of 1917 shall be construed to impose the taxes therein mentioned upon the basis of consolidated returns of net income and invested capital in the case of domestic corporations and domestic partnerships that were affiliated during the calendar year 1917.

"(b) For the purpose of this section a corporation or partnership was affiliated with one or more corporations or partnerships (1) when such corporation or partnership owned directly or controlled through closely affiliated interests or by a nominee or nominees all or substantially all the stock of the other or others, or (2) when substantially all the stock of two or more corporations or the business of two or more partnerships was owned by the same interests: Provided, That such corporations or partnerships were engaged in the same or a closely related business, or one corporation or partnership bought from or sold to another corporation or partnership products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or one corporation or partnership in any way so arranged its financial relationships with another corporation or partnership as to assign to it a disproportionate share of net income or invested capital. * * *

"(c) The provisions of this section are declaratory of the provisions of Title II of the Revenue Act of 1917." 42 Stat. 319.

[2] Section 326 of the Revenue Act of 1918, 40 Stat. 1092, is substantially the same as Section 326 of the Revenue Act of 1921, 42 Stat. 274.

The parties agree, and the Board found, that throughout 1916 and 1917 Wigton owned all of the stock of the three companies involved, other than directors' qualifying shares, and that therefore the first condition of affiliation clearly was fulfilled. The Board also found that the Coal Company, as the lessee of the Land Company, was mining coal at a royalty rate of 8 cents per ton and that the Supply Company sold merchandise to the employees of the Coal Company in return for token money issued by the Coal Company.

The petitioner lays emphasis upon its contention that the royalty rate of 8 cents per ton charged by the Land Company to the Coal Company, as operating lessee, was substantially lower than the ordinary royalty rate for similar mining operations in the Clearfield district at that time and that therefore the Coal Company bought from the Land Company products at prices "below the current market, thus effecting an artificial distribution of profits" within the terms of the statute. The petitioner contends that the prevailing royalty rate was 10 cents per ton in the Clearfield district.

In respect to this contention the Board stated as follows:

"What were the circumstances and conditions, the terms of the uniform lease agreements under which it might be said that there was a 'prevailing royalty rate' at 10¢ per ton in the Clearfield District of Pennsylvania at March 1, 1913? There is no answer to be found in the record. Are the Coal Company's leases which it owned at March 1, 1913, comparable in the rights they confer and the obligations they impose upon the lessee with the uniform lease agreements which, it might be said, establish a 'prevailing royalty rate'? That question is unanswered in the record. The leases are not in evidence, and all that we have been told about them is they run to exhaustion of the coal and provide for royalty payments of 8¢ per ton of coal mined. Not knowing what the provisions of the Coal Company's leases are, or the provisions of the uniform agreements which establish a 'prevailing royalty rate', we are certainly in no position to make a comparison of the former with the latter for the purpose of determining whether the Coal Company's leases called for less than what was considered a fair royalty in the Clearfield District at March 1, 1913."

■■ This statement by the Board seems incorrect in one particular. Two leases of coal properties adjoining the property leased to the petitioner, and in one case underlying a seam leased by the petitioner, are in evidence, viz., the Ashman Coal Company lease and the Victoria Coal Mining Company lease. These two leases respectively were executed upon the 20th day of April, 1909, and the 2d day of August, 1909. But we are not satisfied that the Ashman and Victoria leases, even when considered with the testimony of Womelsdorff, an experienced mining engineer called by the petitioner, are sufficient to establish the prevailing royalty rate as contended for by the petitioner. The decision, however, as to the weight of evidence rests with the Board and we are not prepared to say that the Board in refusing to find that the prevailing royalty rate in the Clearfield district was 10 cents per ton of coal mined acted capriciously or arbitrarily in view of the absence from the record of the petitioner's leases.

■ The petitioner, however, refers to other circumstances which it alleges show a condition of affiliation between the Coal Company and the other corporations. We will discuss some of these circumstances. The three companies had their principal offices in the Real Estate Trust Building at Philadelphia. This item tends to prove affiliation, but as we have stated previously the determination of the weight of testimony is for the Board. The petitioner contends that in the year 1917, $125,500 par value of the bonds, originally issued in the amount of, $200,000 by the Land Company, were outstanding, and upon these bonds the Land Company paid interest, which payments in fact were made for the benefit of the Coal Company and Wigton, the owner of the Coal Company's stock. We can find no evidence which supports the contention that interest was paid upon the outstanding bonds of the Land Company by the Land Company for this reason. As stated by the Board, the Land Company acquired its properties "* * * in exchange for its bonds of the par value of $200,000 and its stock of the par value of $5,000." There is no evidence of record tending to prove that the consideration thus given by the Land Company for the property represented anything but a fair price. It is a matter of record in the case at bar that the Board allowed the Land Company paid-in

surplus because of the transaction referred to.

■ The petitioner also refers to certain accounts due and owing between the three companies, totaling $90,073.18, and refers to these as "inter company indebtedness." The existence of such accounts does not of itself prove affiliation, but again the weight of such evidence is for the determination of the Board.

■ The petitioner also lays emphasis upon the fact that the Supply Company served as a commissary, that token money was used at the commissary by the employees of the Coal Company and was redeemed by the Coal Company from the wages of its employees, and that therefore the Supply Company functioned as an integral part of the Coal Company. If so, the petitioner did by indirection that which the law of Pennsylvania prohibited it from doing directly.[3] But in our opinion there is no sufficient ground for this court to set aside the ruling of the Board by reason of this particular issue. In the last analysis, we deem that the test of affiliation of these companies is there economic necessity to each other. Business may be so related despite divergent corporate purposes. In the case at bar, however, the economic connection between the Coal Company and the Supply Company was superficial in its nature and did not exist of necessity. Nor were the Coal Company and the Supply Company engaged in closely related business. In this connection the Board stated:

"In the instant proceeding there is lacking proof of facts necessary to show that the Coal Company and the Supply Company were engaged in a closely related business. Not only does the proof fail to show that the Supply Company was an essential adjunct to the Coal Company, but, on the contrary, under the statutes of Pennsylvania, a coal mining company is prohibited from operating a commissary for the purpose of selling merchandise to its employees. We need not inquire into the reasons for this legislation, although one of them, at least, may be obvious. Furthermore, there is no evidence showing that the Coal Company bought from or sold to the Supply Company, or that the Supply Company bought from or sold to the Coal Company. It does appear that the Supply Company was selling merchandise to third parties, namely, employees of the Coal Company. It does not appear, however, that the Supply Company was selling to all of the employees of the Coal Company or that those employees of the Coal Company who bought from the Supply Company bought all of their necessary merchandise from that company. It does not appear that there were no other commissary stores there or nearby where the employees of the Coal Company could, if they wished, do their trading for merchandise. Nor is there any showing that the Supply Company did not deal with others than the employees of the Coal Company. The evidence shows that the employees of the Coal Company could draw their wages in token money which the Supply Company would accept for merchandise. This token money was redeemed by the Coal Company out of funds withheld from the employees' wages. By this arrangement the Coal Company did not guarantee or obligate itself to pay the Supply Company for merchandise purchased by any employee of the Coal Company. It merely obligated itself to pay its own obligations, as evidenced by the tokens, by redeeming them when presented for redemption. It does not appear that the Supply Company had the only commissary or store there or nearby which thus accepted such token money for redemption by the Coal Company. Clearly the petitioners. have not shown that the Coal Company and the Supply Company were engaged in a closely related business."

■ Further we can see no sufficient basis. in the evidence for holding that the Coal Company was affiliated with the Land Company. Certainly they were not engaged in the "same" business within the meaning of subsection (b) of section 1331. Nor were the respective businesses of the companies. "closely related" within the meaning of the first provision of subsection (b).

We think that the principles enunciated in the case of United Thacker Coal Co. v. Commissioner, 1 Cir., 46 F.2d 231, govern the fact situation presented by the case at bar. See also Montgomery Cotton Mills v. United States, 67 Ct.Cl. 169, certiorari denied 280 U.S. 560, 50 S.Ct. 18, 74 L.Ed. 615; Nowland Realty Co. v. Commissioner, 7 Cir., 47 F.2d 1018; Brownsville Coal & Coke Co. v. Heiner, D.C., 38 F.2d 248.

We concur in the ruling of the Board of Tax Appeals.

---

[3] Act Pa., June 9, 1891, P.L. 256, §§ 1, 2, 15 P.S.Pa. §§ 1574, 1575.

(2), (3), (4) and (5) As to the Value for Tax Purposes of Coal, Buildings, Coke Ovens and Surface Land Conveyed to the Land Company.

On July, 9, 1914, coal in the ground, buildings, coke ovens and surface lands were conveyed by the trustee, pursuant to the written instructions of Clyde, Clyde's executors and Wigton, to the newly incorporated Land Company. The consideration paid by the Land Company consisted of $5,000 par value (all) of its capital stock, and $200,000 par value of bonds secured by the mortgage on the properties conveyed.

The Commissioner determined the values of these properties as follows:

Coal in the ground........... $136,359.76
Buildings .................... 40,000.00
Coke ovens ..................  ........
Plant ....................... 30,000.00
Surface land ................ 4,840.00
                             _____
  Total ................... $211,199.76

The Board of Tax Appeals supported this determination of values made by the Commissioner, and held that deductions for depreciation and depletion must be based upon such values and that these values when depleted and depreciated should be used as the basis for computing the consolidated invested capital for the years 1917 and 1921, inclusive, and therefore for computing the consolidated income for the respective years.

Petitioner for its part contends that the values of the properties were not less than the following:

Coal in the ground......... $220,000.00
Buildings .................... 83,000.00
Coke ovens ................. 30,000.00
Plant ...................... 30,000.00
Surface land ............... 24,000.00
                             _____
  A total of.............. $387,000.00

It will be noted that the Board and the petitioner concur in the valuation of only one item, the plant.

The question presented to this court for determination under these headings of the assignment of errors is a plain one. The applicable statutes are section 207 of the Revenue Act of 1917, c. 63, 40 Stat. 300, and section 240(a) and section 240(b) of the Revenue Act of 1918, c. 18, 40 Stat. 1057. In the case at bar it is admitted that no questions of the manner in which the applicable statutes should be interpreted are presented.

Administrative findings on issues of fact must be accepted by the court as conclusive if the evidence was legally sufficient to sustain them and there is no irregularity in the proceedings. Phillips v. Commissioner, 283 U.S. 589, 600, 51 S.Ct. 608, 612, 75 L.Ed. 1289; Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 736, 79 L.Ed. 1343; Bishoff v. Commissioner, 3 Cir., 27 F.2d 91; Denver Live Stock Commission Co. v. Commissioner, 8 Cir., 29 F.2d 543.

The question of the fair market value of the properties transferred upon July 9, 1914, was an issue of fact and the Board's determination cannot be disturbed by this court if there be substantial evidence to support it. Was such substantial evidence before the Board?

(2) As to the Value of Certain Coal in the Ground Conveyed to the Land Company for its Stock and Bonds on July 9, 1914.

In order to arrive at the solution of this question, we think it desirable to review briefly the testimony presented to the Board. Hess, the chief engineer of the Coal Company, testified before the Board that he made use of diamond drill hole records and working maps, showing the thickness of the coal in both the B and C seams of the Coal Company and by these methods was able to determine the thickness of the coal. He further testified as to the specific gravity of the coal and, basing his opinion upon the experience of the company and of the industry in Pennsylvania, he determined that the recoverable coal belonging to the Land Company consisted of a total of 6,075,600 tons, as of July 9, 1914. He further estimated the maximum daily capacity of the No. 1 shaft and the Cunard slope as being 2,000 tons. Making further calculations based on the average number of operating days per year and safety factors, he reached the conclusion that the expected annual production would be upon the basis of 270,000 tons, which would cause the exhaustion of the mine in twenty-two years. He further concluded that since all of the Land Company's coal was based upon the 8-cent per ton royalty basis that the annual rent to the Land Company would be $21,600, and that the present worth of an annuity of $21,600 for twenty-two years at the discount rate generally used for computing the value of coal properties would be $220,-

320. It was therefore his opinion that the coal properties transferred to the Land Company by the trustee had a value of $220,320 upon that date.

Womelsdorff, a mining engineer, testified that he had examined the coal properties in 1914 to the end that he might make a report in connection with the $200,000 face value bond issue heretofore referred to. He stated: "I think the purpose was to show whether a $200,000 bond issue could be issued on that property safely. I reported favorably on the property."

Wigton himself testified and referred to Hess' estimate of value as being "very conservative."

These witnesses, as stated by the Board, were "unquestionably qualified by several years' training and practical experience in the bituminous fields of Pennsylvania to give expert testimony in the valuation of bituminous coal properties."

The Commissioner called but one witness, Meiring, who had had about twelve years' experience in the coal fields of Kentucky and Illinois before he was employed by the Revenue Bureau. His testimony shows that he had considerable practical experience in the operation of coal mining properties in the states referred to, that he had done mine engineering work in connection with his profession as a mining engineer, and that he had made between five hundred and a thousand valuations of coal mining properties as an engineer for the Bureau of Internal Revenue. This witness had never examined the properties here in question and his professional experience had not been in Pennsylvania.

Without going into detail as to the testimony of this witness, it is sufficient to say that he testified that the coal properties[4] under discussion under this heading of the opinion did not have the value ascribed to them by the petitioner's witnesses for the reason that Meiring deemed that these witnesses overestimated the amount of coal available and underestimated the difficulties and expense of mining it. The Board in summing up Meiring's testimony reached the conclusion that the maximum value placed by him upon the coal acquired by the Land Company on July 9, 1914, was in the sum of $50,810.

So far as the record shows, the Board rejected this valuation as it did the much higher valuations of Hess, Womelsdorff and others, and accepted the valuation made by the Commissioner.

The petitioner relying upon the decision of this court in Boggs & Buhl v. Commissioner, 3 Cir., 34 F.2d 859, contends that the Board could not rely upon Meiring's testimony to reach the conclusion it did reach as to the value of the coal upon these premises. The petitioner cites other authorities following the principle enunciated in Boggs & Buhl v. Commissioner, supra. In Nachod & U. S. Signal Co. v. Helvering, 6 Cir., 74 F.2d 164, that principle is stated as being generally to the effect that the Board of Tax Appeals may reject expert testimony regarding value of properties transferred to a taxpayer and reach a different conclusion based upon its own knowledge, experience or judgment, but may not reject such testimony unless the Board itself has knowledge of the controversy and experience relating to it. As stated by the court in Nachod & U. S. Signal Co. v. Helvering, supra (page 167), the Board "* * * cannot arbitrarily disregard all affirmative and positive testimony applicable to value in a particular case. Nor can it rely wholly upon the presumption of correctness that attaches to the findings of the Commissioner."

In our opinion the testimony of the witness Meiring is weakened by the fact that he was never upon the premises which he purported to appraise and therefore could not have had first-hand knowledge of the mining conditions in the Clearfield district, but his testimony was none the less competent expert testimony. Determination of the weight of this evidence was the function of the Board as a fact-finding tribunal. The circumstances of the case at bar distinguish it from the authorities cited by the petitioner. In the case at bar there was a conflict of expert testimony. The rule enunciated by the decision in Boggs & Buhl v. Commissioner, supra, and Nachod & U. S. Signal Co. v. Helvering, supra, does not apply.

And in our opinion there is other evidence in the record which serves to support the conclusion of the Board as to the value of the coal properties. Expert testimony may be delusive. Experienced

---

[4] Morrisdale 1,000-Acre Tract; Morrisdale 300-Acre Tract; Cunard 1,336- Acre Tract; Rothrick 90-Acre Tract.

men testify to widely divergent conclusions of fact. Market value, the price that a thing has brought at sale, may offer a sounder test. In the case at bar, the record shows that upon July 9, 1914, the "Morrisdale Mines property," including the coal properties here under discussion, together with the buildings, coke ovens, plant and surface land, were conveyed to the newly incorporated Land Company for a price the equivalent of $205,000, viz., $200,000 face value of bonds and $5,000 par value stock.

In view of the record, and carefully weighing all pertinent circumstances, we are of the opinion that the petitioner failed to sustain the value of $200,000 which it sought to place upon the coal properties. We sustain the ruling of the Board of Tax Appeals.

### (3) As to the Value of Certain Buildings Conveyed to the Land Company upon July 9, 1914.

The Commissioner and the Board determined that the value of the buildings conveyed to the Land Company upon July 9, 1914, by the trustee, was $40,000. The petitioner contends that these buildings had a value of $83,000 upon that day.

The question presented is identical with that under (2), supra, viz., is there substantial evidence to support the finding of the Board?

Smith, chief engineer of the Coal Company, testified that he made a detailed appraisal of the value of certain buildings. A map of the properties was made by the witness showing the location and insurable (80 per cent. of total) value of each building. The total value of the buildings so estimated was $83,075, but the Board found that this appraisal included, " * * * at least, 22 buildings valued at $8,655 which it appears never did pass to the Land Company. These 22 buildings were located on the 'Pardee and Ashman 1066 [5] acre tract' which was under lease to the Coal Company, and the Land Company has never owned any interest in that tract." Wigton in fact testified: "The area of land on the map [6] enclosed in purple, amounting to 1,366 acres, is the Berger, Pardee and Ashman tracts. * * * The Land Company had nothing to do with the Pardee, Ashman and Berger tracts, and had no interest at all in them."

It is contended by the petitioner that coal leases often, in fact, usually, provide that the lessee shall have title to any buildings erected by him with the privilege of removal at any time, but such an assertion does not seem pertinent under the facts of the case at bar.

The Board rejected the petitioner's valuation of the buildings, stating that it constituted cost of reproduction in kind. The witness Smith testified, however: " * * * I made an estimate of the cost at the time to replace a building, and made what I felt was a proper allowance to depreciate it or reduce its value to the value of the house that then existed." The value placed by the witness upon the buildings therefore seems to have been a depreciated value estimated by him about May, 1914. Such a method of valuation has the approval of the law to the extent that such valuation along with all other relevant facts must be considered in determining value. Standard Oil Co. of New Jersey v. So. Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; Clinton Cotton Mills v. Commissioner, 4 Cir., 78 F.2d 292; Cameron v. Commissioner, 3 Cir., 56 F.2d 1021.

The Board held in substance that the buildings went with the lease of the coal and therefore could possess no value beyond the life of the coal fields, which had been estimated at twenty-two years as heretofore indicated. The logic of this reasoning seems irresistible. Though the buildings were essential in producing the coal from the mines, none the less we think it clear that they possessed no other real value. Since this is the case it would seem exorbitant to place upon them a value approximately equal to one-third of the value contended for by the petitioner as the value of the coal in the ground. In reference to the valuation of the buildings the Board stated: "They apparently were leased along with the coal without additional consideration to the Land Company. The evidence is that their average useful life is twenty-two years, the estimated time required for exhaustion of the coal. If it is probable that they would have a value beyond that time, for any

---

[5] Actually 1,366 acres, composed of the following: Pardee and Ashman 1,066 acres, and Berger 300 acres.

[6] Exhibit 10.

purpose other than that for which they were intended, proof of the fact is lacking * * * Regardless of the type and character of the construction of the buildings or the materials of which they are constructed, prudence and sound business judgment would limit a cash investment in these buildings to their value as a facility for mining the coal * * *."

■ The Board's finding in substance is to the effect that reproduction cost, less depreciation vaguely, estimated, does not reflect the true value of the buildings to the Land Company. The Board accepts the valuation of the Commissioner which must be assumed to be prima facie correct. Nichols v. Commissioner, 3 Cir., 44 F.2d 157; United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; United States v. Mitchell, 271 U.S. 9, 46 S.Ct. 418, 70 L.Ed. 799.

■ We are aware of no circumstance in the case at bar to cause us to set aside the finding of the Board in this particular.

### (4) As to the Value of the Coke Ovens upon July 9, 1914.

■ The petitioner claims that the Board erred in deeming the 106 coke ovens acquired by the Land Company upon July 9, 1914, to be of no value. These ovens had been constructed prior to December, 1906, and had cost $33,342.29. Their physical life admittedly was one hundred years and they could not have been built in 1914 for less than the sum of $31,008. The Board stated in its opinion in respect to these coke ovens: "It is clear from the testimony of Wigton that these particular ovens are obsolete and have been abandoned, being last used in 1914 and 1915. Under the circumstances, they are no longer a part of the earned surplus of the Land Company. Their obsolescence was brought about by a change in metallurgical processes. The evidence does not show whether this change took place before or after July 9, 1914. In all probability, considering the fact that the ovens were used less than two years and probably less than one year by the Land Company, the change took place prior to the basic date and the ovens had reached an advanced state of obsolescence when acquired by the Land Company."

In our opinion the conclusion or inference so drawn by the Board is a proper one and is supported by the evidence. Furthermore, there is no evidence in the record of this cause which could lead one to the conclusion that there was any substantial value in the ovens. In view of their indubitable obsolescence none would desire to replace them, and obsolete, they possessed no value.

In our opinion, the conclusion of the Board ascribing no value to the coke ovens should be upheld.

### (5) As to the Value of the 242 Acres of Surface Land Conveyed to the Land Company.

■ 242 acres of surface land were conveyed by the trustee to the Land Company upon July 9, 1914. To this land the petitioner ascribes a value of no less than $24,200. The Board, however, approved the finding of the Commissioner fixing its value at $4,840.

In this connection, Smith, the petitioner's chief engineer, testified that in his opinion this land had a value of $100 an acre. It appears from the record that it was used for buildings, dwellings, store, railroad sidings, and necessary repair shops. Two shafts were located upon it. 75 of the 242 acres were leased and under cultivation. Womelsdorff testified that the 242 acres of surface land in his opinion had a value of approximately $150 an acre, and that a township road traversed the property, tending to enhance its value.

The testimony offered on behalf of the petitioner in respect to the value of the land seems to us to be unconvincing. The value of the buildings and structures upon it has been dealt with by us heretofore and the naked value of the surface of the land is here under scrutiny. In our opinion, neither as farming land nor land used in connection with mining could any such value as the witness testified to be placed upon the fee. There is no testimony to show any value for agricultural purposes except as to 75 acres. Agricultural value alone would remain in the fee when the coal under the land had been mined to exhaustion. The value put upon the land for surface use in mining of necessity is limited by the life of possible mining operations and the witnesses state nothing in respect to this aspect of the matter. The Board accepted the determination of the Commissioner, which as we have stated is prima facie correct and must stand unless overcome by substantial evidence.

**(6) As to the Value of Machinery and Equipment Conveyed to the Coal Company.**

On July 9, 1914, Wigton, having acquired all of the capital stock of the petitioner, caused certain machinery and equipment to be conveyed to it without consideration. The Commissioner determined that the value of the property so conveyed was $134,196. The petitioner claimed that it was worth the sum of $302,311.01, and based this value upon an inventory, Exhibit 29, made as of June 30, 1914. The Board sustained the determination of the Commissioner.

The controversy here turns upon the question of whether or not the items shown in the inventory of June 30, 1914, were actually delivered and turned over to the Coal Company by Wigton upon June 30, 1914. The respondent contends that the inventory was of all the machinery and equipment at the mines—"* * * that is, it included all the machinery and equipment previously owned by the Coal Company, *plus* the machinery and equipment which were transferred to it on July 9, 1914."

The Board stated in its opinion: "We understand that this inventory is a list of all of the machinery and equipment in the possession of the Coal Company on June 30, 1914. There is no direct evidence that this inventory is a list of the items which Wigton actually paid in to the Coal Company. Two witnesses testified for the petitioners that they believed there was a bill of sale evidencing the trustee's conveyance to the Coal Company, but it could not be located. Petitioner's Exhibit 59[7] shows that the Coal Company purchased numerous items of machinery and equipment, during the period July 1, 1908 to June 30, 1914, and charged the costs thereof on its books to expenses. It is reasonable to assume that the trustee transferred to the Coal Company such machinery and equipment as were transferred to him by the Coal Company by bill of sale dated August 3, 1906, the inventory of which machinery and equipment was not presented in evidence. It is also reasonable to assume that, since the inventory of June 30, 1914, contained all the machinery and equipment at the mines as of that date, it included (1) the machinery and equipment transferred to the trustee and by him, at the request of Wigton, transferred back again to the Coal Company, (2) such machinery and equipment, if any, purchased or acquired by the Coal Company between August 3, 1906 and July 1, 1908, and (3) the machinery and equipment set forth in Exhibit 59."

The petitioner refers to the "Schedule of Depreciation of Equipment" made by the Commissioner, part of the deficiency letter for the years 1918 to 1920, inclusive, as tending to prove otherwise. In this schedule appears the following statement: "Valuation allowed on equipment acquired July 9, 1914—$134,196.00." The petition of the Coal Company to the Board of Tax Appeals alleges that "On July 9, 1914, there was conveyed to the Coal Company as paid-in surplus by Mr. F. H. Wigton, machinery and equipment of the value of $302,311.01. The Commissioner has allowed a value of only $134,196.00 for this property * * *." In his answer to this petition the respondent admits "* * * for the purpose of depreciation and invested capital, the Commissioner has allowed a value of $134,196.-00 on certain machinery and equipment paid in as of July 9, 1914." We can perceive no inconsistency between this admission and the finding of the Board and the Commissioner.

Wigton himself testified in respect to this matter as follows: "When the Morrisdale Land Company was organized on July 9, 1914. * * * The machinery and equipment which the trustee held at the time went to the Morrisdale Coal Company, where it had been before. That company was using it all the time under the rental agreement that I have testified to. * * * The machinery and equipment were conveyed to the Coal Company through me at my direction. * * * Potter (the trustee) * * * conveyed the machinery and equipment to the Coal Company * * *."

Exhibit 59 shows the addition of items to the machinery and equipment of the Coal Company in the period from July 1, 1908, to June 30, 1914, which total $125,717.96. An examination of the respective exhibits, 59 and 29, indicates some duplication of items. There is also some duplication of items upon the inventory itself.

Under the circumstances we hold that there is sufficient evidence to support the ruling of the Board, viz., that Exhibit 29, the inventory, includes items purchased by the Coal Company and not conveyed to it

---

[7] Headed "Morrisdale Coal Company. Cost of Capital Additions—July 1, 1908 to June 30, 1914."

by Wigton on July 9, 1914. The Board was justified in accepting the valuation which the Commissioner put upon the machinery and equipment conveyed by the trustee to the Coal Company on July 9, 1914.

### (7) As to the Value of the Coal Leases Owned by the Petitioner on March 1, 1913.

The Commissioner and the Board respectively held that the leases of the Coal Company were without value on March 1, 1913, and that therefore the Coal Company was not entitled to depletion deductions upon these leases in computing income.

As we have stated heretofore, the petitioner contends that the prevailing royalty rate in the Clearfield district was 10 cents per ton upon the kind of coal contained in the "B" seam and 20 cents a ton upon the kind of coal contained in the "C" seam, and that therefore the Coal Company enjoyed preferential advantage of 2 cents a ton on the coal mined from the "B" seam and 12 cents a ton on the coal mined from the "C" seam. The petitioner therefore contends, estimating a recovery period of twenty-three years and discounting the value for 10,918,897 tons of recoverable coal at a 2-cent differential, the value of the 2-cent differential to the Coal Company is determined to be $88,479.32. Similarly the value of the preferential differential of the coal in the "C" seam to the petitioner was $97,920.

The respondent contends that the cost of mining this coal, as of March 1, 1913, exceeded the market price of the coal and that the coal could not be sold at a profit on March 1, 1913; that therefore the coal possessed no value over and above the actual royalty rate contracted for.

Upon October 4, 1924, the Coal Company filed with the Bureau of Internal Revenue, in connection with the determination of its liability for income taxes, Form E, "Schedule for Valuation of Coal Properties." In this schedule it reported its mining costs and the selling prices for its coal per ton. For the years 1909 to 1914, inclusive, it reported the selling price per ton as being less than the cost per ton of mining the coal sold. In 1913, the cost per ton was stated to be $1.156 and the selling price per ton was stated as being $1.058.

But was there sufficient evidence to support the finding of the Board of lack of value in the leases over and above the royal-ty rate as of March 1, 1913? In our opinion there was sufficient evidence presented to the Board to sustain its finding in this regard.

The leases themselves were not put in evidence. Nor was secondary evidence offered showing the precise terms and conditions upon which the leases were entered into. The petitioner refers to the showing of profit from the operation of leases of the petitioner in certain years subsequent to 1913. In the sixteen-year period covered by "Form E" filed with the Bureau of Internal Revenue, the cost per ton incurred by the petitioner in mining the coal is shown to be substantially more than the price per ton at the mine. If the years 1925, 1926 and 1927 be added to the computation, further losses are shown. A profit is shown per ton of coal at the mine for the years 1915 to 1920, inclusive, but these are the only years in which the mine was operated at a profit. Losses per ton of coal mined followed in 1921, 1922, 1923 and 1924. If the figures shown by Petitioner's Exhibit 50[8] be added, further substantial losses are shown. If we are to consider the argument of the petitioner in respect to the fat years, we must take into consideration the effect of the lean years as well. Under all the circumstances, it is our opinion that the Board did not err in the finding of fact here under consideration.

### (8) As to the Cost of Petitioner's Development of its Coal Leases and the Board's Ruling in Respect to Depletion Deductions.

The Board allowed the petitioner additional depletion deductions upon development expense in the amount of $222,246.41. The petitioner contends, however, that upon March 1, 1913, it had a coal property on which it had expended $481,712.81 for development and in which there remained 11,734,897 tons of recoverable coal; that this development as of March 1, 1913, had value because it lessened the cost of mining the remaining coal. Specifically, the petitioner contends that it is entitled to deduct the cost of driving headings into the "B" seam, viz., $259,466.40; that these headings lessened the future cost of mining the coal from the "B" seam. The Board held in effect that the driving of these headings could not be deemed to be development work, that there was no sufficient evidence of development work after the tunnels from

---

[8] Reconciliation of returns with income and loss for fiscal years ending June 30, 1925–27.

the "C" seam to the "B" seam had been completed in 1906.

The petitioner further urges upon us that, if the value of the development was greater than cost, as of March, 1913, it was the duty of the Board to determine the value of the development; that the Board did not do this but simply determined the expenditures made upon mining, viz., $481,712.81, eliminated therefrom the sum of $259,466.40, the cost of the headings, and thereafter improperly spread the balance of the cost, $222,246.41, over the coal mined before and after March 1, 1913. We will deal specifically with this contention of the petitioner at a later point in this portion of our opinion.

Hess testified that the fair market value of the development of the mine as of March 1, 1913, was $423,178.08 and that this sum represented the development inside the mine.

The Board ascertained that the cost of the development work upon the mine and the headings driven into the "B" seam to March 1, 1913, was $481,712.81. The Board also found that in the period from March 1, 1913, to June 30, 1914, 15,600 feet of headings had been driven into the "B" seam at a cost of $15,678.38. The total cost of headings driven in the period March 1, 1913, to June 30, 1917, was found by the Board to be $188,369.85. The Board stated: " * * * that the sinking of the three shafts with all of the work incidental thereto and the driving of the tunnels from the 'C' to the 'B' seam were a necessary part of the development of the mine." It found that the cost of this development to March 1, 1913, was $222,246.41. As to the cost of the sinking and construction of the three shafts, totaling $125,161.30, included in the sum of $222,246.41 referred to just above, the Board stated: "As to the first three items * * *[9] we do not know when the costs were incurred, except that it was before March 1, 1913; consequently, we shall have to assume, that they were a part of the orig-

inal development and that their cost was applicable to the entire coal content of the mine." The Board then states that as to the remaining five items,[10] totaling $97,085.11, included in the total of $222,246.41, " * * * we are satisfied that the work which they represent was completed not later than June 30, 1906, as it was development for the opening of the 'B' seam." To the sum of $222,246.41, the petitioner asks that there be added the cost of the driving of the headings in the "B" seam to June 30, 1917, on the ground that the development stage was not passed in the "B" seam until the peak of production was reached in that seam in the fiscal year ended June 30, 1917.

Now the germ of this controversy may be described as follows: Under the regulations, Article 222 of Regulations 45,[11] expenditures in excess of net receipts are to be charged to capital account while the mine is in course of development. We deem that the fair test to determine this is set forth in Regulations 65 of Article 224,[12] providing that a mine quits the development stage and acquires a producing status "when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining."

The Board in its opinion correctly states: "Note that it is not the entire expenditures which may be charged to capital account, but only the expenditures in excess of net receipts; and the obvious reason for this is that the receipts from the sale of minerals recovered while developing the mine reduce the cost of development. Granting for the sake of argument the premise of petitioner's contention (that the development stage of the mine was not passed in the 'B' seam until the fiscal year ending June 30, 1917) and the sufficiency of that premise as justifying the addition to capital account, of that portion of the

9 Shaft No. 1. Sinking and construction $ 49,018.00
Shaft No. 2 Sinking and construction 55,975.00
Shaft No. 3 Sinking and construction 20,168.30

Total $125,161.30

10 Tunnelling Shaft No. 1 $46,345.00
"       "       " 2 3,758.36
"       "       " 3 17,252.67
Beaver Tunnel (1905–1906) 8,056.10
Shaft Sinking (1905–1906) 21,672.98

Total $97,085.11

11 Promulgated under the Revenue Act of 1918, c. 18, 40 Stat. 1057.
12 Promulgated under the Revenue Act of 1924, c. 234, 43 Stat. 253.

cost of driving the headings in the 'B' seam to June 30, 1917, in excess of net receipts from development coal sold, we have no way of determining how much of that cost should be added to capital account, because we do not know what the net receipts from sales of development coal amounted to."

The record fully supports this statement made by the Board in its opinion. There is no source available in the record before us from which it may be ascertained how much of the cost of the development should be added to capital account because there is no evidence as to the net receipts to the petitioner from the sale of development coal.

If the cost of the headings be capitalized, it would produce the effect of adding to the cost of the coal remaining in the ground the expenses incurred by the petitioner in mining the developed coal. Such a result certainly was not within the contemplation of statute or regulation.

In this portion of our opinion we have dealt at some length upon the depletion deductions allowed by the Board as well as upon those which the Board saw fit to disallow and we have carefully considered all phases of the matter. We can perceive no error in the determinations of the Board upon this phase of the case at bar.

**(9) Is the Petitioner Entitled to Have Its Invested Capital Increased by the Amount of Development Expense Found by the Board to Have Been Incurred by it?**

The Board determined the cost of the development of the mine to March 1, 1913, to be the sum of $222,246.41. The items comprising this total have been detailed under the eighth heading of this opinion. The petitioner contends that the undepleted portion of the sum should be included in invested capital for each of the years here under discussion.

The Board, as contended by the petitioner, does in fact take the position that the cost of the headings up to March 1, 1913, in the sum of $259,466.40, was an operating expense and therefore may not be capitalized and depleted, and, as stated by the petitioner, this was done by the Board on the theory that these expenses' had been incurred after the so-called development stage of the mine had passed. Assuming, as did the Board, that the development period of the mine passed no later than the

end of the fiscal year 1909, literally there is no evidence in the record to show the years in which the expenditures were made. It should be borne in mind that here we are concerned with the computation of invested capital for the purpose of estimating excess profits tax, and the date March 1, 1913, is not helpful as in heading (8), supra, where the question involved was the computation of income taxes. Unless there be evidence from which the amount of yearly invested capital may be ascertained, there can be no computation made whereby the capitalized development expenses may be reduced by the amount of depletion sustained within the respective years. Since such evidence is not contained in the record, this ruling of the Board upon this aspect of the case at bar must be sustained.

**(10) Did the Board Err in Disallowing a Loss of $55,975 in Computing the Net Income of the Petitioner (and Therefore Its Consolidated Net Income), for 1919?**

This question turns upon the determination of whether or not the Commissioner and the Board properly disallowed a deduction claimed by the petitioner in the sum of $22,451.10 by reason of loss occasioned by the abandonment of No. 2 shaft in 1919.

This shaft was sunk prior to March 1, 1913. The Coal Company expended $30,375 in building it. The Board held that it could not have been reproduced on March 1, 1913, in its then condition, for less than the sum stated. Coal from both the "B" and "C" seams was mined through the shaft in 1913, but it was not used after 1914 or 1915.

Drillings had first been made in 1916 to ascertain the amount of coal available through the operation of this shaft. Drilling was repeated in 1919. The conclusion reached by Wigton as to abandonment was expressed by him as follows: "I made the final decision with regard to abandonment of shaft No. 2. From memory it was made about 1918, but it is difficult for me to fix accurately the dates, * * * Mr. Maxwell and I sat down and considered it very carefully and I said 'Very well; I am sorry, but we will have to abandon it.' " The petitioner thereupon demolished the buildings used in connection with the shaft and transferred the usable machinery and equipment to other locations

# 287

upon the mining property. Some of the machinery was scrapped or sold.

The question here presented is in fact disposed of in heading (7) of this opinion. Sections 212(a), 213(b) and 214(a) of the Revenue Act of 1918[13] provide that there shall be allowed as deductions, losses sustained in the taxable year incurred in any transaction entered into for profit, and that the taxable basis in the case of property acquired prior to March 1, 1913, shall be the fair market value of the property as of that date. For the reasons heretofore given by us, as determined by the ruling of the Board, we deem that the Coal Company's equity in the leased properties was without market value or value upon March 1, 1913. Consequently, we concur in the ruling of the Board that the Coal Company sustained no deductible loss from the abandonment of shaft No. 2. See United States v. Flannery, 268 U.S. 98, 45 S.Ct. 420, 69 L.Ed. 865; Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991; Mitchell v. Commissioner, 2 Cir., 48 F.2d 697, certiorari denied 284 U.S. 646, 52 S.Ct. 27, 76 L.Ed. 500; Bloch v. Commissioner, 4 Cir., 42 F.2d 1013; Nichols v. Smith, 1 Cir., 35 F.2d 938.

**(11) Did the Board Err in Disallowing Losses in Computation of Net Income of the Petitioner for the Years 1919 and 1920.**

The Commissioner allowed losses as deductions on account of scrapped machinery included in the inventory of June 30, 1914, in computing net income for the fiscal years 1919 and 1920, respectively, in the sums of $6,213.38 and $1,617.41. The petitioner contends that losses of $9,214.26 and $1,783.38 should have been allowed in the respective years. The issue here presented is precisely similar to that discussed by us under the heading of the sixth assignment of error, part (6) of this opinion. In view of our holding under that assignment, we now state that we can find no basis in the evidence sufficient to indicate error upon the part of the Commissioner or the Board of Tax Appeals.

**(12) As to the Disallowance by the Board of Loss Arising out of the Abandonment of Buildings in Computing Net Income of the Land Company and therefore Consolidated Net Income.**

The issue here turns upon the determination of the third assignment of error, dealt with in the third portion of this opinion. We have heretofore indicated our views in respect to the value of the buildings conveyed to the Land Company by the trustee. In view of that determination, we can perceive no error in the ruling of the Board in its decision under this heading of the case at bar.

**(13) and (14) As to the Exclusion from the Invested Capital of the Petitioner of Certain Sums Representing Preferred Stock.**

The Board excluded from the invested capital of the petitioner, for the fiscal years 1918 to 1922, inclusive, certain items representing the issuance of preferred stock, totaling in all $547,580. $76,-150 of this represented preferred stock issued to the Supply Company. Clearly this item was properly excluded since it represented an inter-company transaction. Of the balance, viz., $471,430, representing preferred stock issued to Wigton, the Board included as invested capital the sum of $238,922.20, and excluded $232,507.80. $212,326.53 of the sum of $238,922.20 is shown upon the books of the company as due to "F. H. Wigton, Inv. %," $13,205.-12, is shown upon the books of the company as due to "F. H. Wigton," and $7,-000 is shown upon the books of the company as "F. H. Wigton, Agent." The first item, viz., $212,326.53 is comprised of the sums of $211,126.53, which Pritchard, the petitioner's bookkeeper, testified was entered by him on the Coal Company's books and that he understood Wigton had advanced money to pay for construction and development work, but that he, Pritchard, had no knowledge of the purposes for which the advances had been made. He further testified that he had made this journal entry at Wigton's direction. The sum of $1,200 is shown upon the books of the company as having been expended "for a hoist situated at Shaft No. 2."

The Board stated: "The evidence does not convince us that Wigton ever expended his personal funds, of any amount, for the benefit of the Coal Company. Although Wigton was present as a witness in these proceedings and testified at considerable length on other matters he was not asked any questions bearing upon this particular matter, although he was qualified to state the facts."

The Board also stated: "As to the oth-

---

[13] Chapter 18, 40 Stat. 1057, 1064–1066.

er liability on the company's books, called 'F. H. Wigton,' in the amount of $13,205.-12, and 'F. H. Wigton, Agent,' in the amount of $7,000, in payment of which the company issued to Wigton, preferred stock of $20,205.12 par value, there is no evidence of their origin or the reason for recording them on the company's books. We do not know whether they are based upon valid considerations or not. Considering the fact that Wigton is president of the company, some explanation of the company's liability to him, as agent, should have been offered by the petitioners. We cannot say, with the meagre evidence we have, that anything was received by the Coal Company for the preferred stock issued to Wigton in payment of those two accounts."

Section 207 of the Revenue Act of 1917[14] provides for the inclusion in invested capital of value of property bona fide paid into a corporation in exchange for its stock. The question here presented is one of the weight of testimony offered. We must hold that the Board is the judge of the weight of the testimony. This court may not substitute its judgment for that of the Board, nor can we take unto ourselves the function of determinations of fact for administrative purposes. Phillips v. Commissioner, 283 U.S. 589, 600, 51 S. Ct. 608, 612, 75 L.Ed. 1289; Tracy v. Commissioner, 6 Cir., 53 F.2d 575, 576, 578. The record adequately supports the ruling of the Board, and its decision must be sustained.

(15) As to the Holding of the Board Setting Off the Earned Surplus of the Supply Company Against the Operating Deficits of the Coal Company and the Land Company in Determining the Deficiency for the Fiscal Year Ending June 30, 1918.

The question here presented may be presented briefly as follows: The consolidated balance sheet of the three companies, as of June 30, 1917, shows an operating deficit charged against surplus of $289,-682.04, and of $21,440.35 for the Coal Company and the Land Company, respectively. This balance sheet shows also an earned surplus of $54,129.84 for the Supply Company. The Commissioner proceeded to add the deficits together and set off against that total the amount of the earned surplus of the Supply Company, using the figure supplied by the net as the basis for computing invested capital for the three companies for the fiscal year. No error was assigned upon appeal to the Board in respect to this method of computation. As a matter of fact the Board itself employed a precisely similar method in making its Rule 50, Recomputation.

The respondent contends that it is well settled that only such issues as are properly raised by the pleadings may be considered by the Board and that no new issue may be presented at the special hearing before the Board under Rule 50, for the computation of the amount of the tax. The respondent cites Fifth Street Bldg. v. Commissioner, 9 Cir., 77 F.2d 605, 608; Davison v. Commissioner, 2 Cir., 60 F.2d 50, 51; and Bankers' Pocahontas Coal Co. v. Burnet, Commissioner, 287 U.S. 308, 312, 53 S. Ct. 150, 151, 77 L.Ed. 325, in support of his contention. The Board itself has held that upon hearing under Rule 50 for computation of tax, no new issue may be raised. Great Northern Ry. Co. v. Commissioner, 10 B.T.A. 1347, affirmed on other issues in 8 Cir., 40 F.2d 372. Rule 50 represents a proper exercise of the power of the Board to regulate practice before it. Boggs & Buhl v. Commissioner, supra; O'Meara v. Commissioner, 10 Cir., 34 F.2d 390, 395; Bankers' Pocahontas Coal Co. v. Burnet, supra.

The petitioner, for its part, relies upon Helvering, Commissioner v. Edison Securities Corporation, 4 Cir., 78 F.2d 85, 91, but in the case cited, as stated by the reviewing court in its opinion: " * * * the new matter was not introduced by the parties but by the Board itself."

Had the question presented to the Board for the first time upon hearing under Rule 50 for computation of tax been placed before it as part of the original proceedings, the Board under the law could not have adopted the contention of the petitioner. W. S. Bogle & Co. v. Commissioner, 7 Cir., 26 F.2d 771, 772, in which the court said:

"Another assignment of error deals with the item of surplus and undivided profits as a part of petitioner's invested capital. The Board set off losses of one of the petitioners against the undivided profits of the other companies, in determining

---

[14] Chapter 63, 40 Stat. 300, 306.

the amount of invested capital. In so doing, the Board followed one of the Treasury regulations.

\* \* \* \* \* \*

"No question is here raised as to the applicability of section 240(a) to petitioners' return. But it is contended that the full amount of the surplus shown by the various petitioners should not be reduced by the deficit of any one of them. This contention we cannot accept. It was evidently the plan and purpose of this legislation to wipe out the artificial legal barriers of separate corporate entities (where substantially all of the stock of two or more corporations is owned by the same party) and treat the affiliated corporations as a single unit. To accomplish this purpose it was necessary to look to the invested capital of each petitioner. One might show an increased surplus and undivided profits account, while another would show a deficit. To ascertain the total or consolidated invested capital necessitated the deduction of the deficit of the one from the surplus of the other, and only the difference could be added."

See, also, Mobile Register, Inc. v. Commissioner, 18 B.T.A. 682, 685; Interborough News Co. v. Commissioner, 6 B.T.A. 340; Appeal of Gould Coupler Co., 5 B.T.A. 499, 517. We can find no cases to the contrary.

The petitioner refers to Autosales Corp. v. Commissioner, 2 Cir., 43 F.2d 931, 933, but this case supports the position of the respondent rather than that of the petitioner. In the case at bar the petitioner in fact contends that consolidated invested capital should be composed of the capital and paid-in surplus of the Coal Company and of the Land Company, not reduced by the operating deficits of those two companies, and plus the capital, paid-in surplus and earned surplus of the Supply Company. In other words, the petitioner seeks to add earned surplus to the calculation to be used as the basis for the tax, but would not deduct operating losses from capital or surplus. Such a contention is untenable upon its face and we can perceive no justification for remanding this question to the Board for determination, assuming that we had the power to do so.

The decision of the Board in the case at bar is in all respects affirmed.