ROBERT L. SANZ AND IRENE R. SANZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sanz v. Commissioner
Docket No. 5829-87
United States Tax Court
T.C. Memo 1990-568; 1990 Tax Ct. Memo LEXIS 640; 60 T.C.M. (CCH) 1160; T.C.M. (RIA) 90568; October 30, 1990, Filed *640 Decision will be entered under Rule 155. Jasper G. Taylor, III, Rosemary Mitchell, and Robert F. Corrigan, Jr., for the petitioners. Albert A. Balboni, for the respondent. SCOTT, Judge
SCOTT *641 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' income tax for the calendar years 1979 and 1981, in the amounts of $ 16,920 and $ 509,982, respectively, and for 1979 additions to tax under section 6653(a) and section 6621(c) in the respective amounts of $ 846 and an amount to be determined for the year 1979. [1] Respondent determined additions to tax under section 6653(a)(1) and (a)(2), and section 6621(c) for the year 1981 in the respective amounts of $ 25,255 and amounts to be determined. All of the issues raised by the pleadings have been disposed of by agreement of the parties, except the fair market value, if any, of 4,110 foreign language textbooks donated in 1979 by petitioners to the Prince of Peace Catholic Church, Houston, Texas. FINDINGS *642 OF FACT Petitioners, husband and wife, who resided in Spring, Texas, at the time their petition in this case was filed, filed a joint Federal income tax return for the calendar year 1979 with the Director, Austin Service Center, Austin, Texas. Robert L. Sanz (petitioner) is the son of Robert B. Sanz (Mr. Sanz) who was the founder of a foreign language program known as the "Sanz System." In the 1930s and 1940s, Mr. Sanz developed the "Sanz System" program of teaching foreign languages for the purpose of teaching such languages to select United States Government personnel. During the period from the late 1930s through the early 1970s, Mr. Sanz taught high-ranking government officials, both elected and appointed, including Presidents, Army generals, other military personnel, Defense Department personnel, Central Intelligence Agency personnel, National Security Agency personnel, Internal Revenue Service personnel, Department of Agriculture personnel, and Department of Labor personnel, using the Sanz System. After the teaching of foreign languages to government personnel by the "Sanz System" proved successful, several large companies engaged Mr. Sanz to teach foreign languages to their *643 representatives who were to serve in various foreign countries. Textbooks were written by Mr. Sanz to be used in connection with the teaching of foreign languages through the "Sanz System." These books were published primarily in the 1940s and 1950s. Other than some books for teaching Spanish which were sold from about the mid-1940s to 1951, very few of the books were sold except to students taking courses using the "Sanz System." Occasionally, a student who had taken a course with the "Sanz System" would ask to buy a book with respect to another language and, under these circumstances the book would be sold to the student. Between 40 and 60 languages were taught using the "Sanz System" program and the most commonly taught languages were taught with textbooks written by Mr. Sanz. Mr. Sanz wrote textbooks for use with the "Sanz System" in Spanish, French, German, Russian, Portuguese, Italian, and a number of other languages. These books were written to be used by a teacher who was fluent in the language that was being taught. Initially the government courses in the "Sanz System" were taught primarily in Washington, D.C., but later special language schools using the "Sanz System" *644 were set up at various United States Air Force Bases and other installations. Most of the languages were taught in two courses. The basic course would use Book 1 of the language written by Mr. Sanz and the intermediate to advance course utilized Book 2. The curriculum of the two courses was sufficiently distinct that a government agency or a company could contract for one or the other course depending on the need. Mr. Sanz personally wrote the Spanish and English books without assistance from others. However, he did not feel he was sufficiently fluent in French, Russian, German, and many of the other languages to write the books without assistance. Mr. Sanz would set up the format of the book, but the writing would be done by instructors of the Sanz School in these languages applying and adopting Mr. Sanz's system. Mr. Sanz developed a heart condition in 1972 and gave up teaching in 1973. He had substantially curtailed his teaching activities before 1973. Petitioner joined his father in teaching languages by the "Sanz System" in 1972, after his father had a heart attack on March 14, 1972. However, Mr. Sanz did go to the school or to the defense language institute or other *645 government agency if required during 1973 through 1975. In early 1976 Mr. Sanz sold the Sanz System School. Mr. Sanz was unable to make any satisfactory arrangement with the purchaser of the school to take the textbooks that he had been using in connection with the "Sanz System" and so the textbooks were not sold or transferred to the purchaser of the school. Shortly after selling the school, Mr. Sanz gave the unused textbooks which he still had to his son, one of petitioners in this case. On October 8, 1979, petitioner donated 4,110 of the textbooks given to him by his father to the Prince of Peace Catholic Church in Houston, Texas (the Church), a qualified charity under section 170(c). The books donated were all language textbooks written and published by Mr. Sanz for use in the "Sanz System" foreign language school. Most of them had been written in the early 1950s and had a copyright date of 1951. The quantity of each type of book donated is as follows: Number of
Title
Books
French with Sanz I
990
French with Sanz II
109
German with Sanz I
29
German with Sanz II
122
Russian with Sanz I
960
Russian with Sanz II
1,750
English with Sanz
150
Total number of books
4,110
*646 The textbooks donated by petitioner to the Church were small books without illustrations. They were printed on good paper. They were designed for use with the "Sanz System" course by a professor fluent in the language and familiar with the "Sanz System" of teaching. These textbooks differed in appearance and format from foreign language books customarily used in grade school and high school in the United States during 1979 and later years. The "Sanz System" books had never been used in any university system in the United States, since language was generally taught in the various universities on a different system from the "Sanz System." Most of the books donated by petitioner in 1979 to the Church remained in storage at the Church until early 1986 when 3,000 of these books were shipped to the Archdiocese of Washington, D.C.
Petitioners on their Federal income tax return for 1979 deducted $ 33,840 as the fair market value of the 4,110 language books donated to the Prince of Peace Catholic Church with the statement "valued at cost of reproduction on date of gift 10-8-79." Respondent in his notice of deficiency disallowed the entire claimed deduction of $ 33,840 with the explanation *647 that petitioners had not established that the value of the books donated was in excess of 0. OPINION Section 170(a)(1) allows as a deduction any charitable contribution made during a taxable year to a recognized charitable organization. If a charitable contribution is made in property other than money, the amount of the contribution to be deducted is the fair market value of the property at the time of the contribution. Section 1.170A-1(c) (1), Income Tax Regs. Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of the relevant facts. Section 1.170A-1(c) (2), Income Tax Regs.
The fair market value of property such as the books here involved is a question of fact to be determined from the entire record. Estate of DeBie v. Commissioner, 56 T.C. 876, 894 (1971); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). Where respondent has disallowed a charitable deduction it is incumbent on the taxpayer to show error in respondent's determination. If a taxpayer is able to show error in *648 the disallowance in full of a deduction for the value of property donated to a charity, the fair market value of the items donated must be determined from the available evidence. Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). The record here shows that most of the books given by petitioner to the Church were written prior to 1951 and copyrighted in 1951. The record also shows that these books were not readily adaptable to use for instruction in the languages they covered except in connection with an instructor teaching the "Sanz System". This fact in and of itself would limit the fair market value of the books since there would be a very limited market, if any, to which the books might be sold. However, the fact that the market is limited does not prevent the donated property from having value, but is merely one of the elements to be considered in determining that value. Jarre v. Commissioner, 64 T.C. 183, 190 (1975). Initially, petitioner offered the testimony of an expert in the publication of books in an attempt to establish the fair market value of the donated books. The testimony of *649 this witness shows that he confined his study to determining what the cost to produce the books donated would have been at the date they were contributed to the Church and the amount a publisher would need to receive for the books in order to make a profit from their sale. This witness made it very clear that he did not know whether any books could be sold at the price he determined and that, in fact, when he had made comparable studies for persons considering publication of books, the persons for whom the study was made would decide not to publish the books, since in their judgment the necessary price could not be received. There is some question whether the amounts determined by petitioners' expert as the publication cost of the donated books in 1979 is accurate. However, we do not consider it necessary to discuss this facet of petitioners' expert's testimony since we conclude that his testimony is not helpful in determining the fair market value of the books here involved. Certainly, under some circumstances, reproduction costs of property may give an indication of the value of the property. See, for example, Morrisdale Coal Co. v. Commissioner, 97 F.2d 272, 281 (3d Cir. 1938), *650 affg. a Memorandum Opinion of this Court. However, as was brought out by respondent's expert witness, books become obsolete for reasons totally unconnected with their cost of production and therefore in the case of the books here involved that were over 18 years old at the date of their valuation, reproduction cost is no indication of what a willing buyer would pay a willing seller for these books. Respondent's expert witness testified that no market existed for the books donated by petitioners to the Church. She compared the books used in the "Sanz System" with language textbooks actually in use in 1979 by various schools and concluded that in 1979 no school would have bought these books for use in the teaching of the languages which they were designed to teach. She gave examples of the differences in the books here involved and the books used by various schools and colleges in 1979. We were impressed with her testimony and accept her opinion that the books which petitioner donated could not have been sold in 1979 as textbooks for the teaching of the language to which they related in an ordinary school or university. We also accept her opinion that most specialized schools in *651 1979 had their own books for the teaching of languages which had been updated substantially since 1951. Respondent's expert witness admitted that some schools might have bought one or two Sanz language books in 1979 to put in the library if one were not already available in the library. This would be more likely for a school located in an agency in which the "Sanz System" had previously been used to teach languages. Also some of the prior students of the Sanz program might well have been interested in a volume or two of the books. Respondent's expert witness pointed out that most of the Sanz textbooks were written totally in the language to be taught with no English introduction and, therefore, were not usable except for persons who spoke the language to some extent. Based on the testimony of respondent's expert witness, we conclude that the books donated by petitioner to the Church had very little value in March 1979 when the gift was made. In rebuttal of the testimony of respondent's expert, petitioners presented the testimony of several witnesses who had been taught by the "Sanz System" or associated with the "Sanz System" to the effect that the Sanz foreign language books *652 were good books to use in teaching foreign languages. One of these witnesses, after studying another language at the Sanz school, had wanted to learn Portuguese and had written to the Sanz school and obtained two Portuguese books, which he used to teach himself Portuguese. This witness testified that he might have bought the Sanz Spanish book or the Russian, French, or German Sanz textbooks, if he had had a need for them in 1979. The Portuguese books, which this witness had bought, had explanations in English. The witness testified that it would have been difficult to teach yourself from a foreign language book that had no English explanation. When questioned as to how many books he might have bought, this witness said he might have bought 20 or 30. Another witness who had studied at the Sanz school and had been connected with teaching languages for the military, testified that had he known in 1979 that some of the Sanz books were available he might have bought some. The final witness petitioner offered was a professor at Georgetown Preparatory School in Rockville, Maryland. This witness testified that he would have recommended purchase of Sanz foreign language books for use *653 as a supplemental text at Georgetown Preparatory School had he known such books were available in 1979. When his testimony as a whole is considered, it is not persuasive since apparently he did discuss the Sanz books with various language professors at Georgetown Preparatory School who made favorable comments about the books, but did not suggest that the school purchase any of the books. This witness was an English professor at Georgetown Preparatory School and had no input into the purchase of foreign language books. The most that can be said for the testimony of the various witnesses petitioner offered in rebuttal to the testimony by respondent's expert witness that a market for the Sanz books was lacking in 1979, is that under certain circumstances some persons would have purchased some small number of the Sanz books. Respondent's expert witness conceded that her testimony went to a market in the ordinary sense of the word such as a school system or other teaching institution that normally uses textbooks. She stated that it might be possible to sell a few of the books to various libraries for use of persons who had studied in the "Sanz System" or to sell the books on a distress *654 basis for basically scrap paper purposes. On the basis of this record, we conclude that there was no market for the books donated by petitioners to the Church in 1979 as textbooks to be used as such and that the only market was for an occasional sale to a prior student or for the salvage value of the paper and bindings. There is a sparsity of evidence as to the value of these books on such a basis. However, we conclude that there would be some limited market for these books. A few of the books might have been sold to former Sanz System students and the remainder at salvage value prices. On this basis, we conclude that the fair market value of the 4,110 books when they were donated in 1979 was $ 2,000. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩